**THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**
**CIVIL CASE NO. 1:17-cv-00229-MR-WCM**

| | | |
|---|---|---|
| **MICHAEL ALAN PARKER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **MEMORANDUM OF** |
| **vs.** | ) | **DECISION AND ORDER** |
| | ) | |
| **CHARLES T. MARSTON, JR., M.D.** | ) | |
| **and WILLIS A. ARCHER, M.D.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on the Defendants' Motion for Summary Judgment [Doc. 39].

## I. BACKGROUND

On February 4, 1994, the Plaintiff Michael Alan Parker was convicted of eight counts of first-degree sexual offense and four counts of taking indecent liberties with a child arising from accusations that he, and several others, sexually abused his three minor children in 1992. The Plaintiff was sentenced to eight consecutive terms of life imprisonment plus an additional forty years in prison.

On August 25, 2014, a North Carolina Superior Court vacated the Plaintiff's convictions and dismissed all the charges. After serving more than twenty years, the Plaintiff was released from prison.

On August 21, 2017, the Plaintiff initiated this action against Defendants Charles T. Marston, Jr., M.D. and Willis A. Archer, M.D., pursuant to 42 U.S.C. § 1983, alleging that his convictions were obtained as a result of the fabrication of forensic child medical evaluation reports by the Defendants.[1] [Doc. 1].

The Defendants now move for summary judgment with respect to the Plaintiff's claims. [Doc. 39]. The Plaintiff has filed a Response in opposition [Doc. 48], and the Defendants have filed a Reply [Doc. 50]. The Court held a hearing on the Defendants' motion on February 13, 2019. Having been fully briefed and argued, this motion is ripe for disposition.

## II.    STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might

---

[1] The Plaintiff also asserted fabrication of evidence claims against Detective Walter Clyde Harper of the Henderson County Sheriff's Office. The Plaintiff, however, dismissed his claims against Detective Harper on September 26, 2018. [Doc. 38].

affect the outcome of the case." News and Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010). A "genuine dispute" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A party asserting that a fact cannot be genuinely disputed must support its assertion with citations to the record or by showing that the adverse party cannot produce admissible evidence to support that fact. Fed. R. Civ. P. 56(c)(1). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003). If this showing is made, the burden then shifts to the non-moving party who must convince the court that a triable issue exists. Id. Finally, in considering a party's summary judgment motion, the Court must view the pleadings and materials presented in the light most favorable to the non-moving party, and must draw all reasonable inferences in favor of the non-movant as well. Adams v. Trustees of Univ. of N.C.-Wilmington, 640 F.3d 550, 556 (4th Cir. 2011).

## III.    FACTUAL BACKGROUND

Viewing the forecast of evidence in the light most favorable to the Plaintiff as the non-moving party, the following is a recitation of the relevant facts.

In October 1991, the Plaintiff, his wife Sandra, and their three children -- Staci[2], Michael Jr., and Misty – moved to a mobile home in the Moses Robinson mobile home park in Saluda, North Carolina.  [Doc. 49-13: Misty Parker Dep. at 163-64; Doc. 49-7: Harper Dep. at 142-43; Doc. 1: Complaint at ¶ 45].   On August 22, 1992, after an argument, Sandra Parker left the home with the children.   Mrs. Parker and the children moved to Hendersonville and then to Rutherford County.  [Doc. 49-2: Archer Dep. Exs. 21-22; Doc. 49-10: Arrowood Dep. at 9-10].

On September 23, 1992, Mrs. Parker made a child protective services report to Rutherford County Department of Social Services ("DSS"), alleging that the Plaintiff had physically abused the children.  [Doc. 49-10: Arrowood Dep. at 10-12; Doc. 49-2: Archer Dep. Ex. 22]. Rutherford County DSS Social Worker Regina Arrowood interviewed Mrs. Parker, the children, and a counselor.  [Doc. 49-10: Arrowood Dep. at 15-18; Doc. 49-2: Archer Dep.

_____

[2] Staci's name is spelled in various ways throughout the record.  The Court will utilize the version that appears in the CMEP report at issue.

Ex. 22]. Henderson County DSS Social Worker Linda Simpson interviewed the Plaintiff, his mother, neighbors, and the school principal. [Doc. 49-11: Simpson Dep. at 16-22, 25; Doc. 49-2: Archer Dep. Ex. 21]. At that time, the allegations were of physical abuse, but not sexual abuse. [Doc. 49-10: Arrowood Dep. at 17-19; Doc. 49-11: Simpson Dep. at 23]. On November 28, 1992, Ms. Arrowood substantiated the allegations that the Plaintiff physically abused the children and so notified Mrs. Parker by letter and in person. [Doc. 49-10: Arrowood Dep. at 20-21; Archer Dep. Ex. 22]. At that time, Mrs. Parker had a child custody case pending against the Plaintiff. In response, the Plaintiff had hired an attorney to seek joint custody of the children and visitation. [Doc. 49-12: Michael Parker Dep. at 48-49; Doc. 49-3: Harper Dep. Ex. 60-62].

On December 1, 1992, Mrs. Parker made a second child protective services report at the DSS office. Specifically, Mrs. Parker reported that Staci had disclosed that her father "would lift the front part of the vagina with a fork while inserting a spoon into the vaginal opening" sometimes with her father's friend present, and that Michael Jr. had told staff at Ten Broeck Hospital "that his father had laid on top of him." [Doc. 49-2: Archer Dep. Ex. 29-30; Doc. 49-10: Arrowood Dep. at 21-22]. Ms. Arrowood interviewed Staci that day. Staci told Ms. Arrowood that a remark at breakfast caused

5

her to remember that "her father would touch her 'bottom' with a spoon and fork" and, on one occasion, the friend "'put the spoon in until it hurt.'"  [Doc. 49-10: Arrowood Dep. at 25-26; Doc. 49-2: Archer Dep. Ex. 31].  Although it was not in Arrowood's investigative notes [see Doc. 49-2: Archer Dep. Ex. 31], Misty apparently told DSS that her father sexually abused her by sticking a brush into her vagina and rectum [see Doc. 49-1 Marston Dep. Ex. 2].

On January 16, 1993, Ms. Arrowood interviewed Michael Jr.  He described an incident when he was tied to a sofa and his father "was sticking forks and spoons in my bottom" and "put his thing up me" with four other persons present. He also described an incident when his mouth was taped, he was tied to a bed, a man "put his mouth on Michael Jr.'s penis" and his father "put pepper on Michael Jr.'s penis" with other persons in white suits present. [Doc. 49-10: Arrowood Dep. at 29-30; Doc. 49-2: Archer Dep. Ex. 31].  Ms. Arrowood recalled that, as a relatively inexperienced social worker at the time, the children's reports seemed to her to be unusual, very shocking, and possibly exaggerated.  [Doc. 49-10: Arrowood Dep. at 7-8, 37-38].  She noted that the children had not reported the sexual acts in the earlier interviews.  [Id. at 29].

On January 13, 1993 (before Michael Jr. was interviewed), DSS authorized Dr. Marston and Dr. Archer, who were physicians and partners at

Rutherford Pediatrics, P.A. in Rutherford County, to complete forensic medical evaluations of the Parker children under the North Carolina Child Medical Evaluation Program (CMEP).[3] [Doc. 49-2: Marston Dep. Exs. 2, 9; Doc. 1: Complaint at ¶¶ 31-32, 35-36; Doc. 19: Answer at ¶¶ 31, 35-36]. They knew that their medical evaluations of the Parker children would be provided to and used by both DSS and law enforcement. [Doc. 40-1: Archer Dep. at 24-27, 153; Doc. 40-2: Marston Dep. at 15-16, 48]. The Defendants were also aware that they were required to make objective and scientifically valid conclusions during their CMEP exams. [Doc. 40-1: Archer Dep. at 26; Doc. 40-2: Marston Dep. at 48]. In their evaluations of the Parker children, Dr. Archer and Dr. Marston relied on the medical literature, knowledge, and standards at that time related to evidence of child sexual abuse. [Doc. 40-1: Archer Dep. at 33-34, 40-42; Doc. 40-2: Marston Dep. at 22-23, 25-26].

On January 14, 1993, Dr. Marston conducted CMEP examinations of Misty (age 8) and Staci (age 11) at Rutherford Pediatrics for alleged sexual abuse. The CMEP forms indicated that the social worker had reported that Misty and Staci had both reported that their father had sexually abused them

---

[3] The CMEP is a State program that was established in 1976 as a cooperative effort of the UNC School of Medicine's Department of Pediatrics the North Carolina State Division of Social Services, the North Carolina General Assembly, local Departments of Social Services, and local medical and mental health providers. [Doc. 1: Complaint at ¶ 33].

and that "[t]he mother and children are currently hiding from the father due to his abusive nature."  [Doc. 49-1: Marston Dep. Exs. 2, 9].  Additionally, the social worker reported that Misty had described the abuse as "penetration of a brush into the vagina and rectum."  [Doc. 49-1: Marston Dep. Ex. 2].  The social worker further reported that Staci had described the abuse as "holding her vaginal opening with a fork while inserting a spoon into the vagina."  [Doc. 49-1: Marston Dep. Ex. 9].

Dr. Marston did not personally take a history from either Misty or Staci of the alleged abuse and did not assess their reliability, instead relying on the history taken by the social worker. Dr. Marston testified that this was standard protocol at the time so as to avoid the risk of influencing the child's testimony.  [Doc. 40-2: Marston Dep. at 43-45].

The CMEP forms contained spaces in which the examiner could make notes of any findings and observations. To indicate the type of maltreatment, the CMEP forms had boxes to be checked ranging from "emotional," "physical," and "sexual" to "none."  To indicate the degree of the examiner's certainty, the CMEP forms had boxes to be checked ranging from "no maltreatment," "possible," and "probable" to "definite."

Dr. Marston examined both in a frog-leg supine position, using a supine separation labial traction, with a magnifying otoscope.   In  Staci's

examination, Dr. Marston noted the existence of a "thickened rounded hymen remnant," a condition that he considered significant because it was consistent with multiple events of penetration. [Doc. 40-2: Marston Dep. at 89-90; Doc. 49-1, Marston Dep. Ex. 9]. In Misty's examination, Dr. Marston noted the existence of a "rounded, thickened hypervascular hymen with [a] notch[4] at 12 o'clock," a condition that he considered to be consistent with sexual abuse.[5] [Doc. 40-2: Marston Dep. at 46-49, 53; Doc. 49-1: Marston Dep. Ex. 2]. Dr. Marston did not measure the depth of the notch, as measuring "[j]ust wasn't the custom, at the time." [Id. at 81].

Dr. Marston did not perform a colposcopy during his examinations, as he did not have a colposcope at his office at the time. [Id. at 48, 90]. Dr. Marston did not examine either Misty or Staci in any positions other than the frog-leg supine position for a couple of reasons. First, Dr. Marston noted that the lateral recumbent position is primarily used for anal inspections. As for the knee-to-chest position, Dr. Marston stated that this position is primarily

---

[4] Dr. Marston testified that a notch in the hymen "indicates a healed tear." [Doc. 40-2: Marston Dep. at 108].

[5] At his deposition, Dr. Marston noted that the finding in his office note that the notch was at 12 o'clock was in error, and that the notch was in fact at 6 o'clock. [Doc. 40-2: Marston Dep. at 47]. He further recalled that he explained this error during his testimony at the Plaintiff's criminal trial. [Id. at 105]. There is no indication that this error fundamentally changed any of Dr. Marston's opinions.

used for detecting the presence of rectal or vaginal foreign bodies.  [Id. at 49].  He further noted that there is "clear indication in the medical literature" not to use such positions in certain cases, as it can be uncomfortable and embarrassing, and should not be used on a child who has been abused, if the abusive event may have involved the same position.  [Id. at 49-50, 90-91].  In Dr. Marston's opinion, "if the exam is absolutely clear with the frog-leg position and with the supine separation labial traction . . . [and] if the lesions are clear in that position, then the knee-chest position is not always needed."  [Id. at 50].  Dr. Marston testified that, given that "the finding [of a thickened hymen] was pretty clear," examining the girls in different positions "was probably not worth the additional trauma to [them]."  [Id. at 61, 90-91].

Dr. Marston did not photograph his findings, explaining that photographs "were generally done by DSS when they were needed" and that the medical literature warned that photography could be traumatizing, especially if photography may have been part of the abusive event.  [Id.at 51].  In Dr. Marston's opinion, "in a private office, . . . the frog-leg supine and diagrams are adequate . . . in and of themselves."  [Id. at 51-52].  Dr. Marston testified that he did not include a diagram in the CMEP reports because he felt that he "wouldn't know how to draw [the thickened hymen] that would be

any clearer than [his] written description of it." [Id. at 57; see also id. at 89-91].

At the end of the examinations, Dr. Marston wrote on the CMEP report that Misty's "exam is consistent with previous vaginal penetration," and he checked the boxes on the form to indicate that the maltreatment was "sexual" and the certainty of the maltreatment was "probable." [Doc. 40-2: Marston Dep. at 52-55; Doc. 49-1: Marston Dep. Ex. 2]. With respect to Staci, Dr. Marston wrote on the CMEP report that Stacey's "exam [is] consistent with previous vaginal penetration, possibly multiple events" and he checked the boxes indicating "sexual" maltreatment that was "probable." [Doc. 40-2: Marston Dep. at 92, 96; Doc. 49-1: Marston Dep. Ex. 9].

In determining that sexual abuse was "probable," Dr. Marston relied upon "the basic prevalence of sex abuse in the United States, plus the information I had heard from the social worker and the physical exam" to conclude that sexual abuse "was more likely than not, but not definite." [Id. at 38]. Dr. Marston explained that at the time these examinations were performed, the term "consistent with" was used to describe conditions "that were not conclusive proof, but had been seen in girls who had been abused…. It would be fair enough to say that it's consistent with penetration, but it does not prove penetration. It could have happened as she described."

[Id. at 53].  Dr. Marston explained that if he were doing these examinations now, he would use the term "indeterminate" instead of "consistent with" to convey that the examination did not rule out penetration but did not explain it either.  [Id.]

On January 19, 1993, Dr. Archer conducted a CMEP examination of Michael Jr. (age 10) at Rutherford Pediatrics for alleged sexual abuse.  Dr. Archer took a history from Michael Jr. and noted on the CMEP form that Michael Jr. reported that his father had sexually abused him, and that Michael Jr. had described this abuse as penetration.  [Doc. 40-1: Archer Dep. at 123-24; Doc. 40-1: Archer Dep. Ex. 26].  Specifically, he noted that Michael Jr. stated that his "father penetrated rectum with his penis on multiple occasions from approximately age five years until about six months ago.  He denies his father manipulated or hurt the patient's penis or used the patient's mouth in a sexual manner."  [Doc. 40-1: Archer Dep. at 125-26; Doc. 40-1: Archer Dep. Ex. 26].  Dr. Archer was aware that Michael Jr. had a history of chronic constipation and encopresis (the soiling of the bottom with stool).  [Doc. 40-1: Archer Dep. at 43, 51].

During the rectal examination, Dr. Archer had Michael Jr. lie on his side, with his knees pulled up.  When Dr. Archer pulled Michael Jr.'s gluteal muscles and skin apart a little bit, "his rectum just fell open."  [Id. at 44].

When asked whether Michael Jr.'s anal laxity could have been due to constipation, Dr. Archer testified: "I've seen hundreds of kids with chronic constipation, a very common problem that we would have to deal with. And I've never seen a kid who had rectal dilation where they could not close the rectum when the stool was not present." [Doc. 40-1: Archer Dep. at 72]. Having ruled out constipation as the cause of the anal laxity, Dr. Archer chose not to wait until after the stool had passed to perform the examination on Michael, Jr. [Doc. 40-1: Archer Dep. at 70-72, 76-78].

Dr. Archer documented that Michael Jr. had a "very laxed rectal sphincter so that when buttock is spread the rectal opening relaxes to a diameter of 2 centimeters and allows visualization of stool 6 centimeters inside the bowel." [Doc. 40-1: Archer Dep. Ex. 26]. He checked "abnormal" for anal laxity on the CMEP form and did not observe any other abnormal physical findings. [Doc. 40-1: Archer Dep. at 137; Doc. 40-1: Archer Dep. Ex. 26]. Dr. Archer wrote on the CMEP report, "With the enlarged rectal opening, the history of penetration of this child's rectum with an adult penis when the child was five or six years old seems very probable. Penetration was probably on multiple occasions." [Doc. 40-1: Archer Dep. Ex. 26]. He checked the boxes indicating "definite" sexual maltreatment. [Id.].

Defendants' CMEP reports were sent to Rutherford County DSS and Detective Walter Harper at the Henderson County Sheriff's Office.  [Doc. 49-10: Arrowood Dep. at 41-42; Doc. 49-2: Archer Dep. Exs. 31, 34-36].  On January 28 and February 17, 1993, Detective Harper interviewed the Parker children.  During the interviews, the children made allegations of ritualistic sexual abuse by the Plaintiff, his mother, neighbors, and others in the community.  [Doc. 49-7: Harper Dep. at 53, 103-27, 133-76; Doc. 49-2: Archer Dep. Exs. 33-38].  Without the Defendants' opinions of sexual abuse, Detective Harper may not have recommended criminal charges and he would have been hesitant to seek indictments without further investigation. [Doc. 49-7: Harper Dep. at 102, 142].  To Detective Harper, the CMEP reports corroborated the children's allegations and demonstrated the need for further investigation.  [Id. at 96, 141-42].

On February 8, 1993, the Plaintiff was indicted in Henderson County on twelve charges alleging statutory sexual offenses and indecent liberties involving his three children.  [Doc. 49-3: Harper Dep. Exs. 67-68].  His 63-year-old mother Mildred Parker and eight others were also indicted.  [Doc. 49-7: Harper Dep. at 105-06, 197-98; Doc. 49-3: Harper Dep. Exs. 69-70].

On January 18, 1994, the Plaintiff's criminal trial began.  The State was represented by ADA Michael Edwards and the Plaintiff was represented by

J. Michael Edney. [Doc. 49-15: Edney Aff. at ¶ 3]. Both Defendants testified at trial, and their CMEP reports were admitted into evidence and published to the jury. Neither Dr. Archer nor Dr. Marston testified at trial that the Plaintiff himself had committed sexual abuse of the Parker children, only that there was evidence consistent with abuse. On February 4, 1994, the Plaintiff was convicted of all charges and he was sentenced to eight consecutive life sentences plus forty years in prison.[6] [Doc. 49-3: Harper Dep. Ex. 75].

On November 27, 2013, the Plaintiff filed a Motion for Appropriate Relief in the Henderson County General Court of Justice, Superior Court Division, relying upon the affidavits of Cynthia Brown, M.D. and Jerry Bernstein, M.D. On August 25, 2014, Superior Court Judge Marvin Pope, Jr. entered an Order, finding that Dr. Brown's and Dr. Bernstein's opinions constituted newly discovered evidence which, when considered along with the "significant advances and changes not only in child medical evaluations but also in the forensic interviewing of children who may be victims of sexual abuse," warranted the vacatur of the Plaintiff's convictions and the dismissal of all charges against him. [Doc. 49-2: Archer Dep. Ex. 50]. Thereafter, the

---

[6] After the Plaintiff's trial, Mildred Parker entered into a plea agreement with the State and received probation. [Doc. 49-7: Harper Dep. at 204; Doc. 49-8: Edwards Dep. at 96-97; Doc. 49-3: Harper Dep. Ex. 76]. The other cases were dismissed due to lack of evidence. [Doc. 49-7: Harper Dep. at 204-05; Doc. 49-3: Harper Dep. Ex. 77].

Plaintiff was released from prison, having served more than twenty years for these convictions.

In his deposition of March 5, 2018, Dr. Archer testified that he was confident of his opinions in 1993 and 1994 and remains confident in his opinions today. [Doc. 40-1: Archer Dep. at 82]. In his deposition of February 20, 2018, Dr. Marston similarly testified that, other than some of the terminology not being used beyond the 1990s, he believes that his opinions are still valid. [Doc. 40-2: Marston Dep. at 21-22]. Moreover, the Defendants have presented the testimony of three additional experts, who opine that the Defendants' examinations met the standard of care as it existed in 1993 and that their conclusions were reasonable based upon the medical knowledge at the time. [See generally Doc. 40-5: Adams Aff.; Doc. 40-6: Sinal Dep.; Doc. 40-7: Goodwin Dep.].

In her original affidavit submitted to the MAR Court, Dr. Brown opined that although "[o]bservation of a rounded, thickened hymen was cause for concern to a pediatrician in 1993-1994, . . . even under the criteria at that time, such a finding alone would not have supported a conclusion of 'probable' abuse." [Doc. 49-1: Brown 2012 Aff. at ¶ 27]. She also testified that Dr. Marston's examination of the Parker girls failed to comply with "current standards of practice." [Id. at ¶¶ 23, 24, 40, 42, 43].

Dr. Brown later clarified, however, that her prior affidavit was intended merely "to correct the interpretation of the genital findings based on subsequent research published in the medical literature over the last 25 years." [Doc. 40-8: 2018 Brown Aff. at ¶ 3]. Dr. Brown attests that in her opinion, "Dr. Marston's examination of the children and his interpretation of the genital findings were within the standard of care based on the prevailing medical knowledge in 1993." [Id.]. Dr. Brown further attests that she has "never stated nor [does she] hold the opinion that Dr. Marston fabricated evidence in his evaluation of the Parker children in 1993 or in his subsequent testimony." [Id.].[7]

Dr. Bernstein opines that Dr. Marston did not comply with the prevailing standards of practice with respect to his examinations of Misty and Staci in 1993, and that Dr. Marston's conclusions in his reports "were not supported by his reported findings or by the existing medical knowledge." [Doc. 49-4: Bernstein Report at 1]. Specifically, Dr. Bernstein opines as follows:

> The standards of practice required that Dr. Marston verify his finding by examining Stac[i] in the "knee chest" position. Oftentimes, what appears to be a thickened hymen when the child is in the supine position disappears when the child is placed in the knee-chest position. Because he did not follow this

---

[7] Dr. Brown has never opined on Dr. Archer's testimony, findings or opinions.

standard procedure, Dr. Marston's findings are unreliable and could not reasonably form the basis for a finding of probable abuse.

Further, at that time, a verified finding of a thickened hymen remnant ***would only support a conclusion that sexual abuse was possible*** in light of the reported history. There was no scientific or statistical basis for Dr. Marston's conclusion that sexual abuse was probable or that the findings were "consistent with previous vaginal penetration, possibly multiple events" or "consistent with a history of vaginal penetration."

[Id. at 3] (emphasis added).

With respect to Dr. Archer's findings and conclusions, Dr. Bernstein opines that "Dr. Archer did not comply with the prevailing standards of practice with respect to his examination of Michael Parker Jr.," and that the conclusions reached in his report "were not supported by existing medical knowledge." [Id.]. Specifically, Dr. Bernstein opines as follows:

Dr. Archer should have conducted further inquiry due to his finding of anal dilatation with stool present in the rectal vault at the time of Michael Jr.'s examination. In light of the finding, the standards of practice required Dr. Archer to take a detailed history about Michael Jr.'s encopresis and chronic constipation, and to re-examine him, preferably in the knee-chest position, when there was no stool present in the rectal vault. However, Dr. Archer did not take a detailed history, did not re-examine Michael Jr. when stool was not present, and did not use the knee-chest position. There was no contact between Michael, Jr. and his father for five months before Dr.

Archer's examination. Anal dilatation resulting from alleged sexual abuse would not have persisted for five months. Michael, Jr. had a well-documented history of chronic constipation and encopresis. The condition observed by Dr. Archer on January 19, 1993, was diagnostic of chronic constipation and not of sexual abuse.

…

At the time of his examination, a verified finding of anal dilatation with stool present in the rectal vault ***would only support a conclusion that sexual abuse was possible*** in light of the reported history. There was no scientific or statistical basis for Dr. Archer's conclusion that sexual abuse was definite, that the findings and history were "very probable," that the physical findings were "very consistent with the possibility" of anal penetration, or that "the history given by Michael is very likely true."

[Id. at 4] (emphasis added).

## IV. DISCUSSION

The Plaintiff's fabrication of evidence claims against Dr. Archer are based on his statements in the CMEP report that Michael experienced "very probable" and "definite" sexual maltreatment, "probably on multiple occasions." [Doc. 40-1: Archer Dep. Ex. 26]. The Plaintiff's fabrication of evidence claims against Dr. Marston are based on his statements in the CMEP reports that Misty and Staci had experienced "probable" sexual

maltreatment, and "possibly multiple events" of vaginal penetration for Staci.[8] [Doc. 49-1: Marston Dep. Exs. 2, 9].

The Defendants contends that they are entitled to summary judgment as to all the Plaintiff's claims, because (1) the Plaintiff's claims are barred by the applicable statute of limitations; (2) the Plaintiff cannot demonstrate that (i) these Defendants fabricated any evidence, (ii) the Plaintiff's loss of liberty resulted from the fabrication, and (iii) despite any intervening acts of independent decisionmakers, the Plaintiff's conviction was a reasonably foreseeable result of the Defendants' initial acts of fabrication; (3) the Defendants are entitled to qualified and absolute immunity; and (4) the Defendants are immune from liability pursuant to N.C. Gen. Stat. § 7B-309. Because the statute of limitations and issues of immunity asserted by the Defendants are potentially dispositive of the Plaintiff's claims, the Court addresses these issues first.

### A.    Statute of Limitations

The Defendants first allege that the Plaintiff's claims are barred by the statute of limitations.

---

[8] The Plaintiff has abandoned the fabrication of evidence claims asserted in the Complaint based on Dr. Marston's "consistent with" statements or the Defendants' opinions stated in the so-called "to whom it may concern" letters. [See Doc. 48 at 14]. Thus, the Court focuses its analysis on the opinions stated by the Defendants in the CMEP reports.

Because there is no federal statute of limitations for 42 U.S.C. § 1983 actions, the applicable limitations period is that which is provided for state tort actions for the recovery of personal injury damages. See Wilson v. Garcia, 471 U.S. 261, 276 (1985). In North Carolina, the applicable statute is N.C. Gen. Stat. § 1-52(5), which provides a three-year limitations period for personal injury claims. Taylor v. Deaver, No. 5:11-CV-341-H, 2012 WL 12905868, at *6 (E.D.N.C. Sept. 28, 2012)

The date that a § 1983 claim accrues, however, "is a question of federal law that is *not* resolved by reference to state law." Wallace v. Kato, 549 U.S. 384, 388 (2007). Under federal law, a cause of action generally accrues when the "plaintiff knows or has reason to know of the injury which is the basis of the action." Cox v. Stanton, 529 F.2d 47, 50 (4th Cir. 1975). Where, however, the action is one for "damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid," the action is not cognizable until the conviction or sentence "has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." Heck v. Humphrey, 512 U.S. 477, 486-87 (1994). "A claim for damages bearing that relationship to a

conviction or sentence that has not been so invalidated is not cognizable under § 1983." Id. at 487. The Supreme Court most recently held that a fabrication of evidence claim by its nature challenges that validity of the underlying criminal proceeding, and thus, such a claim does not accrue until the underlying criminal proceedings have been terminated in the plaintiff's favor. McDonough v. Smith, 139 S. Ct. 2149, 2156-57 (2019).

Here, the criminal proceedings against the Plaintiff were not terminated in his favor until August 25, 2014, when his convictions were vacated. Thus, the Plaintiff's § 1983 claims based on the Defendants' alleged fabrication of evidence in the CMEP reports did not accrue until August 25, 2014. The Plaintiff filed the present action on August 21, 2017, well within the three-year limitations period. Accordingly, the Court concludes that the Plaintiff's claims under § 1983 are not barred by the statute of limitations.

## B. Absolute Immunity

The Defendants next contend that, as trial witnesses sued under § 1983, they have absolute immunity from suit to the extent that the Plaintiff's claims are based upon their testimony at the Plaintiff's criminal trial. [Doc. 40 at 23 n.27]. Additionally, the Defendants argue that they are entitled to absolute immunity from liability pursuant to N.C. Gen. Stat. § 7B-309, which provides immunity for any person who cooperates with a protective services

assessment or testifies in any judicial proceeding resulting from such an assessment, provided that the person was acting in good faith. <u>See</u> N.C. Gen. Stat. § 7B-309.

The Defendants' arguments regarding absolute immunity are without merit. First, the Plaintiff has not asserted any claims against the Defendants based on their testimony at the underlying criminal trial. Moreover, the absolute immunity afforded trial witnesses does not extend to pretrial, non-testimonial acts of alleged fabrication. <u>See</u> <u>Gregory v. City of Louisville</u>, 444 F.3d 725, 739 (6th Cir. 2006) ("nontestimonial, pretrial acts do not benefit from absolute immunity, despite any connection these acts might have to later testimony"). Furthermore, a state statute that immunizes a person from liability is pre-empted under § 1983 and therefore unenforceable in a federal civil action. <u>See</u> <u>Martinez v. California</u>, 444 U.S. 277, 284 n.8 (1980) ("Conduct by persons acting under color of state law which is wrongful under 42 U.S.C. § 1983 . . . cannot be immunized by state law.") (citation omitted). Accordingly, N.C. Gen. Stat. § 7B-309 does not afford the Defendants absolute immunity in this case.

### C. Qualified Immunity

Next, the Defendants contend that they are entitled to qualified immunity.

Qualified immunity "is an entitlement not to stand trial or face the other burdens of litigation…." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). The application of qualified immunity requires a two-part inquiry. First, the Court must determine "whether a constitutional right would have been violated on the facts alleged." Saucier v. Katz, 533 U.S. 194, 200 (2001), overruled in part by Pearson v. Callahan, 555 U.S. 223 (2009). Second, the Court must determine "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." Pearson, 555 U.S. at 232 (citation omitted). "In performing this analysis, however, a court is not required to consider the above two steps in any particular order. A court may exercise its discretion to determine which of the two steps of the qualified immunity analysis 'should be addressed first in light of the circumstances in the particular case at hand.'" Williams v. Ozmint, 716 F.3d 801, 805-06 (4th Cir. 2013) (quoting in part Pearson, 555 U.S. at 236). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." Saucier, 533 U.S. at 201.

Here, the Plaintiff contends that his conviction was obtained as a result of the fabrication of the CMEP reports by the Defendants. The Fourteenth Amendment to the United States Constitution guarantees criminal

defendants the due process right "not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigatory capacity." Washington v. Wilmore, 407 F.3d 274, 282 (4th Cir. 2005). Courts have recognized that "forensic examiners act in an investigatory fashion when they interpret and document physical evidence." Gregory v. City of Louisville, 444 F.3d 725, 740 (6th Cir. 2006). Thus, forensic examiners, such as the Defendants in this case, are subject to the same standards of liability as a police officer and may be held liable for the fabrication of evidence in the course of a criminal investigation. See id. Moreover, the right not to be deprived of liberty through the use of fabricated evidence was clearly established in 1993, when the events relevant to the present litigation occurred. See Washington, 407 F.3d at 283-84 (citing Miller v. Pate, 386 U.S. 1, 7 (1967) ("[T]he Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence.")).

Having identified the particular right at issue, and having determined that such right was clearly established at the time that the Defendants completed their forensic examinations of the Plaintiff's children, the Court turns to the issue of whether the Plaintiff has presented a forecast of evidence from which a reasonable jury could conclude that his constitutional rights were violated by either of the Defendants in this case.

To defeat the Defendants' assertion of qualified immunity, the Plaintiff must present a forecast of evidence from which a reasonable jury could conclude that the Defendants deliberately or with a reckless disregard for the truth provided false forensic evidence. Massey v. Ojanit, 759 F.3d 343, 357 (4th Cir. 2014); Washington, 407 F.3d at 282; White v. Wright, 150 F. App'x 193, 198 (4th Cir. 2005).

Fabrication of evidence alone, however, is not sufficient to establish a due process claim. The Plaintiff must also present a triable issue of fact as to whether his conviction (1) actually resulted from the fabrication and (2) was a reasonably foreseeable result of such fabrication. See Massey, 759 F.3d at 354 ("[C]onstitutional torts, like their common law brethren, require a demonstration of both but-for and proximate causation.") (citing Evans v. Chalmers, 703 F.3d 636, 647 (4th Cir. 2012)).

Here, the Plaintiff's fabrication of evidence claims against Dr. Marston are based on his statements in the CMEP reports that Misty and Staci had experienced "probable" sexual maltreatment and "possibly multiple events" of vaginal penetration for Staci. Specifically, the Plaintiff relies on the opinions of Dr. Brown and Dr. Bernstein to show that Dr. Marston's conclusions did not have a scientific or statistical basis and were not justified under the medical science prevailing at the time of the examinations in 1993.

The Plaintiff does not present a forecast of evidence of an intent on the part of Dr. Marston to fabricate the findings in his CMEP reports. Thus, the Plaintiff must rely on circumstantial evidence in order "to raise an inference of intent." White, 150 F. App'x at 199. The Plaintiff contends that such intent may be inferred from the following: (1) Dr. Marston's knowledge that Misty had not reported sexual abuse during the prior visit; (2) the absence of a clear, consistent, and detailed history of abuse at the time of the exams; (3) the unusual statements of abuse reported by the social worker; (4) the documented finding in Misty's exam of an unmeasured anterior notch, and subsequent revision to a posterior notch; (5) the lack of verification of the findings in the knee-to-chest position; (6) the absence of any drawings or photographs of the findings; (6) Dr. Marston's knowledge that a "consistent with" finding was not diagnostic of sexual abuse and only supported a finding of "possible" sexual abuse; (7) the unclear and inconsistent stories from DSS of abuse to the girls; (8) the unusual strength of his opinions; and (9) his attempts to justify the opinions at trial with statements that were not supported by any studies and lacked a scientific basis. [Doc. 48 at 17-18]. At best, however, this forecast of evidence establishes that Dr. Marston was careless or negligent in conducting his forensic examinations of the female Parker children, and that his opinions would no longer be considered valid

under prevailing medical standards.[9]   A mere showing of negligence by a forensic examiner, however, cannot defeat qualified immunity.  See Ferris v. City of Cadillac, 726 F. App'x 473, 480-81 (6th Cir. 2018) ("The question for this court is not whether a self-interested litigant can find an expert to say the defendants got it wrong, but whether the evidence — including any expert opinions — creates a genuine issue of material fact that Defendants fabricated that evidence.");  Brewer v. Hayne, 860 F.3d 819, 825 (5th Cir. 2017) ("Plaintiffs have made a compelling showing that Defendants were negligent in their forensic analysis, but negligence alone will not defeat qualified immunity."); Caminata v. County of Wexford, 664 F. App'x 496, 501 (6th Cir. 2016) (expert testimony characterizing forensic examiner's investigation as "huge mistakes" that would not be expected of someone with

---

[9] In fact, one of the experts relied upon by the Plaintiff disclaimed any opinion that Dr. Marston was even negligent in his examination of the girls.  While Dr. Brown expressed disagreement with Dr. Marston's techniques and conclusions in her 2012 Affidavit before the MAR court, she later explained in her 2018 Affidavit as follows:

> It is my opinion that [Dr. Marston's] examination of the children and his interpretation of the genital findings were within the standard of care based on the prevailing medical knowledge in 1993.  It was my intention in the previous affidavit to correct the interpretation of the genital findings based on subsequent research published in the medical literature over the last 25 years.  The findings described by Dr. Marston would no longer be considered specifically diagnostic of penetrating trauma.

[Doc. 40-8: 2018 Brown Aff. at ¶ 3].

his level of experience "impugns the quality of [the examiner's] investigation, [but] it is insufficient to establish knowing fabrication or deliberate or reckless falsehoods, rather than mere negligence"); Burgess v. Baltimore Police Dep't, No. RDB-15-0834, 2017 WL 4947004, at *17 (D. Md. Oct. 31, 2017) ("forensic examiners who improperly manipulate, suppress, or destroy physical evidence in an effort to alter the results of their tests should be liable for fabricating evidence, but courts must be careful not to open the floodgates of litigation against forensic examiners whose analysis is less than perfect – and more properly challenged via cross-examination at trial").

Viewed in the light most favorable to Plaintiff, the record at best demonstrates that Dr. Marston was negligent in his examination of the female Parker children. A conclusion of negligence, however, "does not establish a constitutional violation." Caminata, 664 F. App'x at 501; see also Ahlers v. Schebil, 188 F.3d 365, 373-74 (6th Cir. 1999) ("At best, however, the investigation's lack of thoroughness might support an inference of negligence, but it does not demonstrate knowing or intentional behavior designed to violate [the plaintiff's] constitutional rights."). As the Plaintiff has failed to present a triable issue of fact as to whether Dr. Marston fabricated evidence, the Court concludes that Dr. Marston is entitled to qualified immunity with respect to the Plaintiff's § 1983 claims.

Dr. Archer's findings present a more difficult question. Dr. Archer made findings of "very probable" and "definite" sexual maltreatment of Michael, Jr., "probably on multiple occasions." These findings were premised on the anal laxity and dilation that Dr. Archer observed upon examination, along with the reports of sexual abuse made by Michael, Jr. to DSS (and subsequently relayed to Dr. Archer). The Plaintiff has presented a forecast of evidence through the opinions of Dr. Bernstein that Dr. Archer performed an inadequate examination of Michael, Jr. because he failed to wait until the stool present in the child's bowel had passed before conducting his examination. According to Dr. Bernstein, the anal laxity/dilation observed by Dr. Archer, when considered with Michael, Jr.'s known history of bowel issues, was in fact diagnostic of only chronic constipation and "there was no scientific or statistical basis" for a finding of "very probable" or "definite" sexual abuse. [Doc. 49-4: Bernstein Report at 4]. Based on Dr. Bernstein's opinions, a reasonable jury could conclude that Dr. Archer's examination of Michael, Jr. was so "grossly deficient" as to raise an inference that his findings on the CMEP report were fabricated. See Ferris, 726 F. App'x at 479-80. Particularly considering the abbreviated nature of Dr. Archer's examination of Michael, Jr., as well as his knowledge of Michael, Jr.'s history of chronic constipation and its presentation, Dr. Archer's providing of a report

30

that sexual abuse of Michael, Jr. was "definite" could be found by a jury to be reckless, or even to constitute the presentation of an overt falsehood. Dr. Archer's report gave his opinion the air of scientific *certainty*, where no such scientific certainty existed. Thus, as to this issue the Plaintiff's forecast of evidence is sufficient to survive summary judgment.

While the Plaintiff has presented a triable issue of fact as to whether Dr. Archer's findings were fabricated, that is not the end of the inquiry. The Plaintiff must also present a forecast of evidence from which a reasonable jury could conclude that Dr. Archer's report was both a "but for" and proximate cause of the Plaintiff's loss of liberty. The Plaintiff fails in establishing these critical elements. In prosecuting the Plaintiff, the State relied not only on the opinions of Dr. Archer, but also the testimony of the investigating police officer, Detective Harper; the testimony of a psychiatrist who opined that the Parker children had been subjected to sexual abuse; the opinions of Dr. Marston of the "probable" sexual abuse of Misty and Staci; and the testimony of the three Parker children, who all testified that their father had abused them. [See Doc. 49-5 at 26-27]. In short, the State had an abundance of evidence upon which to convict the Plaintiff, regardless of

the findings in Dr. Archer's CMEP report.[10]  In light of this volume of evidence, a jury could not reasonably find that Dr. Archer's report of "very probable" and "definite" sexual abuse was a cause (either "but-for" or proximate) of the Plaintiff's convictions.  It should be noted that the Plaintiff relies exclusively on the assertion that the *report* contains a fabrication.  But Dr. Archer testified and was subject to cross-examination before the jury *on this point*.  Thus, a jury could not reasonably find that the Plaintiff's convictions were the reasonably foreseeable result of Dr. Archer's report.  For these reasons, the Court concludes that Dr. Archer is also entitled to qualified immunity with respect to the Plaintiff's § 1983 claims.

## O R D E R

**IT IS, THEREFORE, ORDERED** that the Defendants' Motion for Summary Judgment [Doc. 39] is **GRANTED**, and the Plaintiff's claims are hereby **DISMISSED WITH PREJUDICE**.

---

[10] The Plaintiff contends that his convictions were a reasonably foreseeable result of the Defendants' CMEP reports in part because the opinions of abuse were a prominent part of the State's closing argument at trial.  [See Doc. 48 at 22-23].  Notwithstanding such prosecutorial tactic, which was arguably very improper, every jury is instructed that the arguments of the attorneys are just that – arguments – and that the jury must consider and weigh only the *evidence* in determining whether a defendant is guilty of an offense beyond a reasonable doubt.  Presumably the jury did so here.  Moreover, the volume of evidence of guilt that the jury had to consider consisted of much more than just Dr. Archer's report.

A Judgment consistent with this Order will be entered contemporaneously herewith.

**IT IS SO ORDERED.**

Signed: August 12, 2019

Martin Reidinger
United States District Judge